IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CONSTANCE HARGIS, | ) | Case No. 1:25-cv-00832-JRA |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

**I.      Introduction**

Plaintiff, Constance Hargis ("Hargis"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards or support her decision with substantial evidence I recommend that the Commissioner's final decision denying Hargis' application for DIB be vacated and that her case be remanded for further consideration.

**II.      Procedural History**

Hargis filed for DIB on December 20, 2021, alleging a disability onset date of December 19, 2021. (Tr. 100; 282-83). Her claim was denied initially and on reconsideration. (Tr. 100-08; 110-18). She then requested a hearing before an ALJ. (Tr. 157). Hargis, represented by counsel, and a vocational expert ("VE") testified before the ALJ on November 10, 2022. (Tr. 69-98). On

December 5, 2022, the ALJ issued a written decision finding Hargis not disabled. (Tr. 119-34). The Appeals Council remanded the December 2022 decision on September 11, 2023. (Tr. 135-38). Hargis, represented by counsel, appeared for a second hearing before the ALJ on January 18, 2024, with VE Amia Hakelia also appearing. (Tr. 35-70). The ALJ issued a second unfavorable decision on February 9, 2024. (Tr. 15-34). The Appeals Council denied her request for review on February 21, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Hargis timely filed this action on April 25, 2025. (ECF Doc. 1).

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence[1]

Hargis worked in the past as an assembler of plastic hospital products, which she actually performed at an unskilled, sedentary level, with constant exposure to pulmonary irritants during this job. (Tr. 29, 66-67).

### B.    Relevant Medical Evidence[2]

Just before the alleged onset date, on November 16, 2021, Hargis presented to Kimberly Enochs-Smith, APRN, CNP, for a lung screening. (Tr. 523). CNP Enochs-Smith noted Hargis was an active smoker and smoked an average of one pack per day. (Tr. 523-24). Hargis reported shortness of breath and coughing without mucus. (Tr. 523). She reported that she was restricted in physically strenuous activity and could carry out light duty work; she reported a Modified Medical Research Council Dyspnea Scale ("MMRC") of 2, meaning that she walked slower than

---

[1] The ALJ made no findings as to Hargis' age or education in either decision. (*See* Tr. 18-30; 124-31).
[2] Hargis' allegations solely relate to her physical impairments. I therefore similarly limited my review of the medical evidence. She did not make any arguments related to her mental impairments, and, accordingly, any such is argument is forfeited. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("Arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.").

others of the same age because of breathlessness, or needing to stop for breath when walking at her own pace. (Tr. 524). CNP Enochs-Smith indicated Hargis had been diagnosed with COPD. (*Id.*). She recommended Hargis have a CT scan of her lungs to screen for lung cancer and counseled on smoking cessation. (Tr. 526-27).

On November 17, 2021, Hargis underwent a CT lung screening. (Tr. 657-64). Results demonstrated a solid nodule of 2.3 mm in the right upper lobe and a calcified nodule of 3.7 mm on the left upper lobe. (Tr. 660). In addition, there were "[i]nnumerable ill-defined centrilobular groundglass nodules in both lungs" which were "likely due to respiratory bronchiolitis." (*Id.*). Additional findings included trivial upper lobe paraseptal emphysema; smooth bronchial wall thickening throughout both lungs; mild atelectasis in the middle lobe and lingula; and mild dependent groundglass atelectasis in the bilateral posterior lung bases, right more than left; mild focal proximal LAD coronary calcification; minimal calcification of the aortic annulus; and mildly dilated pulmonary artery. (*Id.*). No signs of lung cancer were found. (Tr. 661). Hargis was recommended to continue annual screening. (Tr. 664).

After the alleged onset date, on February 22, 2022, Hargis attended a postsurgical physical therapy session with Elaine Allen, PTA. (Tr. 705). PT Allen noted that Hargis had tolerated the session with increased pain and had reported she still had pain on the left side of the neck and radiating into the shoulder and upper back. (*Id.*).

On February 23, 2022, Hargis met with neurologist Chen Yan, M.D. (Tr. 700). Dr. Yan noted Hargis had cervical spine surgery on January 12, 2022, which Hargis stated had not helped and that her hands still bothered her. (Tr. 701). Hargis reported frustration that she could not use her hands and could not type or do anything requiring fine motor movements. (*Id.*). Dr. Yan

discussed with Hargis that numbness can indicate irreversible, permanent nerve injury, increased Lyrica to 150 mg twice daily, and recommended follow up in three months. (Tr. 704).

On March 7, 2022, Hargis met with Lisa Miller, PA-C complaining of bilateral hand numbness. (Tr. 724). Hargis reported having symptoms for about three years, worsening over the last year. (*Id.*). She had attempted wearing a nighttime brace without relief, and the cervical laminectomy and cervical fusion surgery did not change the numbness in her hands. (*Id.*). On examination, Hargis was able to flex and extend all fingers, retropulse the thumb, and abduct all fingers against resistance bilaterally; there was no thenar atrophy. (Tr. 725). She had positive Durkan sign and negative Tinel sign at carpal tunnel bilaterally. (*Id.*). She had a swan neck deformity of her left index finger. (*Id.*). She had diminished sensation to light touch in median nerve distribution bilaterally. (*Id.*). PA Miller diagnosed her with bilateral recurrent carpal tunnel syndrome, and Hargis agreed to bilateral carpal tunnel revision surgery. (*Id.*). PA Miller discussed with Hargis that it was unclear how much her numbness and symptoms would resolve after surgery, given her issues with her cervical spine. (*Id.*). Hargis underwent left carpal tunnel release surgery on April 7, 2022. (Tr. 777-78).

On May 9, 2022, Hargis met with Ni Ketut Hariadi, APRN, CNP, complaining of right shoulder pain, and pain, numbness, and tingling in both hands. (Tr. 2261). She was recommended to continue with her current medications, follow up with her ortho provider, attend her neurosurgery appointment on May 13, and continue with occupational therapy. (Tr. 2262).

On May 13, 2022, Hargis met with neurologist Jeremy Amps, M.D., to address her cervical spondylosis with myelopathy and cervical spinal stenosis. (Tr. 2247). Dr. Amps assessed Hargis with persistent numbness in her hands with dexterity complaints. (Tr. 2242). He placed an

order for a cervical MRI without contrast due to recurring or worsening postoperative symptoms, referred Hargis to physical therapy, and recommended follow up in four weeks. (*Id.*).

On May 16, 2022, Hargis attended an occupational therapy session with Nisanne Rassie, five weeks status-post left carpal tunnel revision with vascular fat graft wrap. (Tr. 2224). She stated her hand was feeling good and reported a pain level of three. (*Id.*). She tolerated the session with no issues and demonstrated improvements in range of motion and wound healing. (*Id.*).

On May 17, 2022, Hargis attended a telehealth visit with Dr. Yan regarding her neuropathic pain related to her carpal tunnel syndrome, local left hand injury, and cervical radiculopathy. (Tr. 2208-12). Dr. Yan noted that Hargis had benefit from Lyrica 300 mg twice daily which she tolerated without side effects; she was continued on Lyrica and recommended to follow up in six months. (Tr. 2212).

On October 17, 2022, Hargis met with orthopedist Brennan Cribbins, PA-C, complaining of left lateral hip pain that had started two weeks earlier; she believed it may have been because of a recent vacation where she had done a lot of walking and had possibly aggravated the area. (Tr. 1560). She had been seen by primary care, who recommended she start Mobic and physical therapy. (*Id.*). Hargis had scheduled physical therapy but declined starting Mobic until she had been seen by orthopedics. (*Id.*). On examination, Hargis had full range of motion, appropriate strength with flexion and extension at the knee and hip, normal sensation, negative straight leg raise, FABER, FADER, and log roll tests bilaterally, but she was tender to palpation over the greater trochanter. (Tr. 1561-62). PA Cribbins reviewed recent radiology imaging, which had no acute findings. (Tr. 1562). PA Cribbins assessed Hargis with greater trochanter bursitis of her left hip and started her on Mobic 15 mg daily, recommended she continue with physical therapy,

5

ice the area, and modify her activities. (*Id.*). Ultrasound-guided cortisone injections were possible in the future if conservative treatment did not improve her symptoms. (*Id.*).

Hargis underwent right revision carpal tunnel release surgery on October 6, 2022. (Tr. 1678).

On October 19, 2022, Hargis attended an occupational therapy evaluation with Ryan Dwyer Smith, two weeks after her right carpal tunnel revision surgery. (Tr. 1542). OT Dwyer Smith noted a chief complaint of numbness in the fingertips of her right hand that interfered with a number of physical activities, including lifting, gripping, pinching, twisting, pulling, and carrying. (*Id.*). OT Dwyer Smith noted her prognosis was fair due to the chronic nature of her impairments. (*Id.*). Hargis reported her goal was to get feeling back in her right fingertips so she could hold a cup without dropping it. (Tr. 1543). She reported a pain level of zero. (*Id.*). On March 29, 2023, Hargis was discharged from care for having failed to return for follow up appointments. (Tr. 1544-45).

On December 19, 2022, Hargis met with Dr. Amps for her 11-month post cervical fusion and cervical laminectomy follow up. (Tr. 1406). Notes indicate that preoperatively, Hargis had progressive pain down the arm, weakness, numbness, and difficulty using her hands. (*Id.*). She continued with similar complaints at follow up on June 20, 2022, stating that "it felt like her hands were asleep." (*Id.*). She had had bilateral carpal tunnel release; left on April 7, 2022, and right on October 6, 2022. (*Id.*). At this visit, Hargis again reported continued numbness and tingling in her hands and fingers and difficulty using her arms. (*Id.*). On examination, her incision was well healed, she exhibited a normal gait and generally normal examination results, except for +2 reflexes in her bilateral upper extremities. (Tr. 1408). Dr. Amps noted Hargis'

condition required further workup and ordered imaging to determine neurological deficit or flag the cause of her symptoms. (*Id.*).

On January 5, 2023, Hargis underwent X-rays of her bilateral shoulders to determine possible cause for her pain. (Tr. 1402). Impression results demonstrated no acute findings. (*Id.*).

On April 5, 2023, Hargis treated with neurologist Dr. Yan. (Tr. 1207). During this visit, Dr. Yan noted Hargis had initially treated on September 15, 2021. for neuropathic pain and paresthesias. (*Id.*). Hargis complained of persistent paresthesias in her right hand and continued pain with limitations of motor activity in her left hand. (*Id.*). Hargis had no response to amitriptyline or topiramate but had switched to Lyrica with some benefit. (*Id.*). She previously had a cervical laminectomy, C3-6 and C3-T1 posterior fusion without alleviation of symptoms. (*Id.*). She was on Lyrica 300 mg twice daily with the plan to add an ALA; she was also taking Effexor 150 mg and Latuda 40 mg daily for mood. (*Id.*). On examination, she had 5/5 strength in all areas but had mild intention tremors in her bilateral upper extremities. (Tr. 1211). She had a mildly wide-based gait, with independent tiptoe, but held onto examiner for heel and tandem gait. (*Id.*). Dr. Yan noted that Lyrica still helped, but that Hargis' chronic symptoms were likely from irreversible and permanent nerve injury. (*Id.*).

Hargis returned for her annual lung screening with CNP Enochs-Smith on April 14, 2023. (Tr. 1175). At this visit, she complained of dyspnea on exertion with stairs or walking a short distance, as well as shortness of breath and cough without mucus. (*Id.*). She reported an MMRC score of one, meaning she gets short of breath when hurrying on level ground or walking up a slight hill. (Tr. 1176). CT scan results from April 14, 2023, noted a 4 mm calcified left lower lobe granuloma, unchanged, with no new or dominant nodules. (Tr. 1166). Other findings included moderate coronary calcifications, mild bronchial thickening, and minimal upper lobe

emphysema, with scattered linear opacities likely atelectasis. (*Id.*). She was recommended to continue with annual screening. (*Id.*). Spirometry results from April 18, 2023, indicated mild obstruction, reversible with bronchodilators. (Tr. 1185).

On June 12, 2023, Hargis treated with Dr. Amps. (Tr. 1035). Dr. Amps noted Hargis was status-post cervical laminectomy C3-C6 and C3-T1 instrumented posterior cervical fusion on January 12, 2022. (Tr. 1035). Preoperatively, she had progressive pain down the arm, with weakness and numbness, and difficulty using her hands. (*Id.*). She reported continued numbness and tingling in her hands and fingers, worse in the thumbs, index, and middle fingers. (*Id.*). She reported neck pain and headaches, not relieved by Tylenol or ibuprofen; she had not tried heat therapy. (*Id.*). She reported symptom onset around early 2022. (*Id.*). On examination, Hargis had normal sensory exam and gait, normal straight leg test and good sagittal balance. (Tr. 1038). However, her left wrist extension was 4/5 and her reflexes were +2 to bilateral upper and lower extremities. (*Id.*). In her Benzel Modified Japanese Orthopedic Scale ("JOA"), Hargis reported that she was unable to button her shirt, but could eat with a spoon; she could walk up/down stairs with a hand rail; she had severe sensory loss or pain in her hands; and she had mild to moderate difficulty with bladder control. (Tr. 1049). She also reported difficulty in completing chores and that she could not do yard work. (Tr. 1051-52). Dr. Amps recommended continuing with medical management of the numbness and tingling in her hands and fingers, with recommendation to follow up in three months. (Tr. 1038-39).

On June 22, 2023, Hargis treated with PA Miller for bilateral hand numbness. (Tr. 1016). PA Miller noted Hargis was status-post right revision carpal tunnel release (as of October 6, 2022) and revision left carpal tunnel release with vascularized fat graft around the nerve (as of April 7, 2022). (*Id.*). Hargis reported having no change in numbness after these surgeries, with

numbness in her thumb, index, and long fingers, left worse than right. (*Id.*). Hargis also reported

pain at the base of her left thumb, worse with gripping. (*Id.*). PA Miller also noted that Hargis

had a bilateral hand tremor, present for many years. (*Id.*). On examination, Hargis was able to

flex and extend all fingers, retropulse the thumb, and abduct all fingers against resistance

bilaterally; there was no thenar atrophy. (Tr. 1018). She had positive Durkan sign and negative

Tinel sign at carpal tunnel bilaterally. (*Id.*). She had full sensation in ulnar nerve distribution but

diminished sensation to light touch in median nerve distribution bilaterally. (*Id.*). She had

stiffness in her left index finger and was tender to palpation over the first CMC joint. (*Id.*). PA

Miller discussed treatment options for the CMC arthritis, recommending oral NSAIDs, Tylenol,

and a corticosteroid injection in the short term, as well as potentially thumb splinting. (Tr. 1017).

PA Miller administered a corticosteroid injection, which Hargis tolerated well. (Tr. 1017-18). PA

Miller recommended Hargis get an ultrasound of her median nerves at the wrist for the persistent

numbness and to follow with neurology for her bilateral hand tremor. (Tr. 1017).

Hargis underwent an ultrasound of both wrists on August 10, 2023, confirming median

nerve neuritis bilaterally. (1012-13). Findings on the right demonstrated an enlarged median

nerve at the carpal tunnel with overlying postoperative scarring, and perineural increased

echogenicity and thickening. (Tr. 1012). On the left, the median nerve appeared enlarged with

prominent fascicles and perineural increased echogenicity and thickening. (Tr. 1013).

On August 15, 2023, Hargis followed up with PA Miller. (Tr. 914). Hargis reported that

the June 22 corticosteroid injection did not help with her left thumb pain, nor did the comfort

cool brace. (*Id.*). Clinical examination results were the same as at the previous visit. (*Compare*

Tr. 916 *with* Tr. 1018). Hargis was not interested in surgical treatment for her left index finger

and opted to give more time for improvement of her hand numbness; she was instructed to follow up if her numbness worsened. (Tr. 915).

On September 19, 2023, Hargis treated with Dr. Yan. (Tr. 886). On examination, Hargis was positive for right knee crepitus on walking, had scarring with swelling and redness of her first metacarpal joint from an old injury, and mild intention tremors in her bilateral upper extremities. (Tr. 890). Her sensation was intact in her bilateral upper extremities. (*Id.*). Her gait was mildly wide based and favored the right lower extremity; she had independent tiptoe and tandem gait. (*Id.*). Dr. Yan noted that Hargis' neuropathic pain likely represented sequelae of chronic nerve injury. (Tr. 891). Her recent Glomerular Filtration Rate ("GFR") was within normal limits. (*Id.*). Dr. Yan continued Hargis on Lyrica 300 mg twice daily and added Lamictal on a slow titration with a note about its potential to increase Latuda side effects, and recommended follow up in three months. (*Id.*).

### C.     Medical Opinion Evidence

On March 18, 2022, state agency reviewing physician Steve McKee, M.D., opined at the initial level that Hargis could perform light work, except that she was limited to frequent bilateral upper extremity hand controls; frequent handling, fingering, and feeling bilaterally; occasional overhead reaching with the left upper extremity; frequent balancing and stooping; occasional climbing of ramps and stairs, kneeling, and crouching; never climbing of ladders, ropes, and scaffolds, never crawling; and she must avoid all exposure to hazards; must avoid concentrated exposure to noise, vibrations, and pulmonary irritants; and avoid all exposure to hazards. (Tr. 105-06). On June 3, 2022, at the reconsideration level, Mehr Siddiqui, M.D., affirmed Dr. McKee's opinion. (Tr. 114-15).

### D.    Administrative Hearing Evidence

Hargis testified at the second hearing before the ALJ on January 18, 2024. (Tr. 40). She testified that she is 61 years old and lives with her husband, who is retired and also has significant health problems. (Tr. 41). She graduated from high school. (Tr. 41-42). She had not worked or received any income for the past two years. (Tr. 42-43). The ALJ previously found that Hargis had worked as an assembler, plastic hospital products, DOT 712.687-010, SVP 2, light, but performed at sedentary. (Tr. 43).

Hargis testified her breathing had gotten worse since the previous hearing and she was using a CPAP machine when she sleeps. (Tr. 44). She expected that she would need oxygen in the future. (Tr. 44-45). She had trouble with her hands, with neuropathy in her left hand. (Tr. 45). She described the hand as "crippled" and that she could not hold a glass, open jars, or pick up change placed on the table. (Tr. 45). She stated she could not do her past work because she could not pick small pieces and glue them onto tubes, and the fumes from the glue caused her breathing problems. (*Id.*). Hargis also stated she could not do a standing job because of a prior back surgery and artificial knees. (*Id.*). She is sad and depressed because she cannot do things; some days she cannot get out of bed because she feels poorly from too much coughing. (*Id.*). She also has difficulty seeing due to glaucoma. (Tr. 46).

Hargis treats with an inhaler, which she uses twice daily, although the prescription is written to use as needed. (Tr. 45-46). She treats her glaucoma with eye drops. (Tr. 46). She takes Effexor and Latuda for her mental health impairments, with some relief. (Tr. 47). She treats with her eye doctor and psychiatrist every six months. (Tr. 46-47).

Hargis has difficulty with her daily activities. (Tr. 48). She can do some dishes and wash herself but has difficulty raising her hand to wash or do her hair, due to shoulder surgery. (*Id.*).

She can still do laundry, cook, and grocery shop, but she does not cook alone because she cannot use a knife to chop. (Tr. 48-49). She reads, watches TV, and goes to AA meetings in her spare time. (Tr. 49). She attends the AA meetings most days, up to five times a week; if she relapses, it is only for a day before she is back and attending meetings. (Tr. 53). She has not used any opioids or illegal substances; any relapse has been with alcohol. (Tr. 54). She watches her granddaughter once a week. (Tr. 50).

Hargis described that she lost her job because of absenteeism after she had used up all of her paid leave with doctor's visits. (Tr. 56). She also had a total right shoulder replacement; she can no longer reach behind her or reach in certain ways or else she can dislocate her shoulder. (Tr. 56-57). She is right-handed. (Tr. 57). Perfume irritates her and causes her to cough, sneeze, and wet herself. (*Id.*). She uses her inhaler if that happens. (*Id.*).

The VE then testified. (*Id.*). The ALJ noted that the VE's resume had not yet been exhibited, but Hargis' attorney had no objections to her qualifications, or for her testifying during the hearing. (Tr. 57-58).

The ALJ proposed the following hypothetical: assume an individual of claimant's age, education, and work experience, who can perform light work with additional limitations of frequently operating bilateral hand controls; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequently balancing; occasionally kneeling and crouching; never crawling; the individual can frequently handle, finger, and feel bilaterally; can occasionally reach overhead on the left; the individual should avoid concentrated exposure to noise and can have frequent exposure to vibration, fumes, odors, dusts, gases, and poor ventilation; never be exposed to hazards of unprotected heights and dangerous machinery. (Tr. 59-60). The VE testified that the hypothetical individual could perform Hargis' past work as per the DOT, but not

12

as performed. (Tr. 60, 66). During the hearing the VE amended her testimony regarding Hargis'

past work, noting that, per Hargis' testimony, she was constantly exposed to fumes from glue.

(Tr. 66).

Hargis' attorney then questioned the VE, asking if she took the first hypothetical from

frequent exposure to fumes and irritants and reduced it to occasional, if the past work would still

be available. (Tr. 61). The VE responded that with a change to occasional exposure to fumes,

odors, and dust the past work would still be available per the DOT and SCO. (*Id.*). However, it

was her opinion, based on her education, training, and experience, that there could be more than

occasional exposure to fumes, odors, and dust. (*Id.*). The VE opined that such work would have

frequent exposure to fumes, odors, and dusts, and pulmonary irritants. (Tr. 61-62). Continuing,

she testified that if the hypothetical individual could have no exposure to pulmonary irritants, she

could not perform Hargis' past work. (Tr. 61).

In response to the ALJ's further questioning, the VE testified that if the hypothetical

individual must avoid concentrated exposure to pulmonary irritants, that Hargis' past work

would remain, under both the DOT, as actually performed, and consistent with her

characterization of the job. (Tr. 62-63). As she explained, avoidance of "concentrated exposure"

to pulmonary irritants, in her definition of the vocational terms, was equivalent to avoidance of

"constant exposure" to those irritants. (Tr. 63-64). As she understood it, "concentrated" referred

to the frequency of exposure, not to the concentration level of the substance itself. (Tr. 64-65).

IV.     **The ALJ's Decision**

1.      The claimant meets the insured status requirements of the Social Security
        Act through December 31, 2026.

2.      The claimant has not engaged in substantial gainful activity since December
        19, 2021, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: degenerative disc disease, osteoarthritis, carpal tunnel syndrome ("CTS"), COPD, hearing loss (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a light work as defined in 20 CFR 404.1567(b) with the following limitations: the claimant can frequently operate hand controls bilaterally; occasionally climb ramps and/or stairs; never climb ladders, ropes, or scaffolds; frequently balance or stoop; occasionally kneel or crouch; never crawl; frequently handle, finger, and feel bilaterally; and occasionally reach overhead with the left upper extremity. The claimant must avoid concentrated exposure to noise (that is, very loud noise); is limited to frequent exposure to vibration, fumes, odors, dusts, gases, or poor ventilation; and can never have exposure to dangerous hazards, such as unprotected heights and dangerous machinery.

6.      The claimant is capable of performing past relevant work as an assembler of plastic hospital products. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from December 19, 2021, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 20-24).

## V.     Law & Analysis

### A.     Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

14

4.    if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.    if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B.    Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Nor will this Court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI.     Discussion

Hargis brings four issues for this Court's review:

1.    The ALJ did not reconcile the inconsistency between the vocational expert (VE) testimony and the Dictionary of Occupational Titles (DOT) regarding the level of exposure to pulmonary irritants in the plaintiff's past relevant work as an assembler of plastic hospital products, as required by Social Security Ruling (SSR) 00-4p.

2.    The ALJ erred in not evaluating the plaintiff's mild intention tremors of the bilateral upper extremities, bilateral median nerve neuritis, or her carpometacarpal (CMC) joint arthritis of the left thumb. As the severity of these impairments was not evaluated at step 2 of the sequential evaluation, and the conditions were not discussed in the residual functional capacity assessment (RFC) or symptom evaluation (or elsewhere in the Decision) the Decision is not supported by substantial evidence.

16

3. The ALJ erred in assessing the plaintiff's RFC, as the RFC contains vague and vocationally irrelevant terms such as "avoid concentrated exposure to noise (that is, very loud noise)."

4. The ALJ erred in assessing the plaintiff's residual functional capacity (RFC), in regards to finding the Plaintiff could be exposed to "frequent exposure to pulmonary irritants."

(ECF Doc. 9, pp. 1-2). I address the final three issues together, because all relate to the ALJ's

handling of Hargis' RFC evaluation.

### A.     The ALJ reconciled the inconsistency between VE testimony and the DOT in accordance with Social Security Ruling 00-4p.

In her first issue, Hargis argues that the ALJ failed to offer a reasonable explanation for

the conflict between the occupational evidence provided by the VE during the hearing and that

found in the DOT, regarding the level of exposure to pulmonary irritants found in Hargis' past

relevant work. (ECF Doc. 9, pp. 8-10). As Hargis contends, the DOT incorrectly classifies her

past relevant work as requiring only occasional exposure to pulmonary irritants, whereas the VE

testified that the job requires up to frequent exposure to pulmonary irritants. (*Id.* at p. 8). Hargis

asserts that the ALJ's failure to follow the VE's testimony is harmful error because she otherwise

should have been found disabled according to application of Medical Vocational Rule 202.04

(*i.e.*, the Grid). (ECF Doc. 9, pp. 7-8).

The Commissioner disagrees, finding no inconsistency to reconcile. (ECF Doc. 11, p. 6).

The Commissioner states that the inconsistency Hargis references is irrelevant because the ALJ

found Hargis able to tolerate up to frequent exposure to pulmonary irritants, consistent with the

VE's testimony of the job requirements as generally performed, and greater than the DOT's rated

exposure level. (*Id.*).

At Step Four, the claimant has the burden to establish that she cannot perform her past

relevant work in light of her RFC. 20 C.F.R. § 404.1520(a)(4)(iv); *see also Wright-Hines v.*

17

*Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010). In evaluating whether a claimant is able to perform his past relevant work, an ALJ will ask the claimant for information about their past work and may consult other sources, such as VE testimony or the DOT. 20 C.F.R. § 404.1560(b); *see also* SSR 00-4p[3] ("We may also use VEs and VSs at these steps to resolve complex vocational issues."). "Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT." SSR 00-4p. At the hearing, the ALJ must ask the VE if his or her testimony is consistent with the DOT and, if it is not, ask the VE to explain that conflict. *See id.* And when such an explanation is given, the ALJ must explain how she resolved the conflict before relying on the VE's testimony. *Id.* When the VE testifies there is no conflict, SSR 00-4p does not require "the ALJ to conduct an independent investigation into the testimony of [the VE] to determine if [the VE is] correct." *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) (noting that it is the claimant's burden, through counsel, to present to the ALJ any argument that the VE's testimony was inconsistent with the DOT). "Furthermore, even if there is a conflict between the expert's testimony and the DOT, 'neither the DOT or [the expert's testimony] automatically trumps when there is a conflict.'" *Id.*, quoting SSR 00-4p.

During the hearing on January 18, 2024, the ALJ admonished the VE if, "during the course of your testimony if it contradicts the DOT please advise us of that." (Tr. 59). The ALJ presented a hypothetical that included "frequent exposure to . . . fumes, odors, dusts, gases, and poor ventilation[.]" (Tr. 60). In response, VE Hakelia testified that such an individual could

---

[3] SSR 00-4p was rescinded and replaced by SSR 24-3p, effective January 6, 2025. *See* SSR 24-3p. However, because the ALJ's decision in Hargis' case was determined on February 14, 2024, before SSR 24-3p's effective date, SSR 00-4p still applies.

perform Hargis' work as per the DOT.[4] According to the VE's testimony, "the DOT and its companion publication state that there is an occasional exposure to fumes, odors, dusts, and pulmonary irritants" for Hargis' past work as a plastic hospital products assembler. (Tr. 62). She continued, "[i]n my opinion, this job is going to have higher than occasional, up to frequent level of exposure to fumes, odors, dusts, gases, and pulmonary irritants. And that's based on my education, training, and experience." (*Id.*). But even though she deviated from the DOT's characterization of the job, VE Hakelia testified that the hypotheticals presented by the ALJ would remain under both her testimony and under the DOT's characterization. (*See* Tr. 63). During the hearing, VE Hakelia amended her testimony to state that Hargis' work as she performed it would not be available under the hypothetical – because Hargis testified to working under constant exposure to glue fumes. (Tr. 66). But the VE was sure to note that the rest of her testimony remained the same – in other words, an individual who was limited to frequent exposure to pulmonary irritants could perform as the work is generally performed according to both the DOT and the VE's deviation; the individual could not perform the work as Hargis actually performed it. (Tr. 66-67).

And the ALJ's decision provides the reconciliation between the VE's testimony and the DOT's classification that SSR 00-4p requires. As the decision states:

> In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as generally performed. The vocational expert at the most recent hearing testified that an individual of the claimant's age, education, work experience, and residual functional capacity could work as an assembler of hospital products as generally performed. Pursuant to SSR 00-4p, I find that this testimony is consistent with the information contained within the DOT except that she reasonably relied on her

---

[4] At this portion of the transcript, VE Hakelia testified that the hypothetical individual could perform both "as per DOT and as performed." (Tr. 60). However, the VE later amended her testimony to state that, according to Hargis' testimony, her past relevant work as performed would require constant exposure to pulmonary irritants. Therefore, the hypothetical individual could perform the work as per the DOT, but not as how Hargis actually performed it. (*See* Tr. 65-67).

> professional experience to determine the impact of limitations not specifically addressed in the DOT, including the differentiation among types of climbing and the unilateral overhead reaching limitation.
>
> Of note, while the claimant's past relevant work was actually performed at the sedentary exertional level, the vocational expert at the most recent hearing found that the pulmonary irritant demands of the claimant's work as actually (but not generally) performed exceed the residual functional capacity. Hence, the claimant can only perform her past relevant work as generally performed.

(Tr. 29). In this, the ALJ correctly stated that the VE testified that Hargis could perform the work as generally performed, and that the VE relied on her professional experience when deviating from the DOT. (*Id.*). The ALJ further was explicit that the VE's testimony stated that the pulmonary irritant demands of Hargis' past work as she actually performed it exceeded the RFC. (*Id.*). Therefore, the ALJ determined that Hargis could perform her past relevant work as generally performed, only. (*Id.*).

In all, I agree with the Commissioner that there is no discrepancy to reconcile between the ALJ's decision, the DOT's description of the past relevant work as generally performed, and the VE's testimony. The only wrinkle, if it can even be called such, is that Hargis' past work as actually performed does not meet the DOT or the testimony – but the ALJ made no such finding. There is no error with respect to this issue. I therefore recommend the District Court affirm as to the first issue.

> **B.**     **The ALJ failed to address all of Hargis' impairments, resulting in an RFC unsupported by substantial evidence.**

Hargis' next three issues all relate to the ALJ's handling of her RFC determination, respectively arguing the ALJ erred in her consideration of Hargis' bilateral upper extremity limitations; the vagueness of the terms used to describe the RFC, and her determination that Hargis could have frequent exposure to pulmonary irritants. (*See* ECF Doc. 9, pp. 1-2; 9-15). Although each argument is of varying merit, I find that Hargis' second issue raised – regarding

20

whether the ALJ fully considered the entirety of her bilateral upper extremity impairments – undermines the validity of the RFC. And because this issue goes to the heart of the RFC determination, it wins the day for the other two.

As Hargis presents, the ALJ's decision is silent as to her mild intention tremors of her bilateral upper extremities, bilateral median nerve neuritis, and her CMC joint arthritis in her left thumb. (ECF Doc. 9, p. 9). Hargis correctly notes that, even if these issues are determined not severe at step two of the sequential evaluation, the ALJ must still consider all impairments, whether severe or non-severe, when forming the RFC. (*Id.*). And because the ALJ makes no mention of these issues in the decision, it is unclear whether the ALJ considered the limiting effects of her bilateral upper extremity tremor, bilateral median nerve neuritis, and CMC arthritis when forming the RFC. (*See id.* at p. 12). This becomes particularly problematic where job requirements demand frequent use of her bilateral upper extremities and require average levels of motor coordination and manual dexterity. (*Id.* at pp. 12-13).

Continuing along this path, Hargis raises error with the ALJ's explanation of vocational terms: "within this case there appears to be multiple interpretations of what is meant by 'concentrated exposure.'" (*Id.* at p. 13, citing to Tr. 28). As she points out, this same term of "concentrated exposure" means "constant exposure" with respect to the VE's testimony regarding pulmonary irritants, that the ALJ misstated the VE's testimony in the decision by stating that it means "frequent exposure" to pulmonary irritants, and then later in the decision, the ALJ applies yet another modifier to state that, avoidance of "concentrated exposure" to noise equates to avoidance of very loud noise. (ECF Doc. 9, p. 13, citing to Tr. 28, 63-64). Moreover, as Hargis states, the DOT provides yet another descriptor – her past relevant work requires "moderate exposure" to noise. (ECF Doc. 9, pp. 13-14). Hargis points out, and I agree, that

21

because of these differing uses of vocationally relevant terms, further clarification of the RFC is necessary. (*Id.*).

Finally, Hargis again raises error with the RFC, stating that the ALJ did not fully consider her respiratory conditions when finding she could perform work that requires frequent exposure to pulmonary irritants. (*Id.* at pp. 14-15). This argument is essentially an amalgam of the previous, along with protestations of the way the ALJ handled her subjective symptom complaints. (*See id.*). I find no particular error with the ALJ's handling of the subjective complaints, but, because the RFC must be reconsidered, the consideration of Hargis' pulmonary function is carried along.

At Step Two, the ALJ considers the medical severity of a claimant's impairment and whether there is a severe medically determinable physical or mental impairment – or combination of impairments – that meets Agency duration requirements. 20 C.F.R. §404.1520(a)(4)(ii). Generally, agency regulations provide that finding no limitations or only mild limitations result in finding a limitation to be non-severe. *See* 20 C.F.R. § 404.1520a(d)(1). An impairment or combination of impairments is non-severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." *Id.* § 404.1522(a).

The Sixth Circuit has construed the Step Two severity regulation as a "*de minimis* hurdle" in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). Under SSR 96-3p, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p, 1996 WL 374181 (July 2, 1996). Even so, the failure to find an impairment is severe may be harmless error. This is because once an ALJ determines that one or more of the claimant's impairments is severe, she must consider all the claimant's severe and non-severe impairments in the remaining

steps of the sequential analysis. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) ("the fact that some of a claimant's impairments were not deemed to be severe at step two is legally irrelevant where other impairments are found to be severe.") (internal quotation and marks omitted).

Later in the sequential evaluation, the ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p. "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p. Thus, the ALJ's failure to find that Hargis' bilateral hand impairments were severe at Step Two would be legally irrelevant if the ALJ had considered the impact of those impairments in the remaining steps of the sequential analysis. *See Anthony v. Astrue,* 266 F. App'x 451, 457 (6th Cir. Ohio 2008). In cases such as this, courts look to see whether the ALJ actually considered the impairments deemed non-severe at later steps in the sequential analysis. *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 191 (6th Cir. 2009); *White v. Com'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009).

And this is where the ALJ's silence (regarding bilateral upper extremity impairments) or confusion (regarding vocational terms) becomes fatal to the RFC. At bottom, the ALJ must provide sufficient explanation in support of her decision such that the claimant and the reviewing court can understand her reasoning. *See, e.g.*, *Richardson v. Saul*, 511 F. Supp. 3d 791, 803 (E.D.

Ky. 2021) (remanding a contradictory RFC where the ALJ's decision was vague, because an administrative "decision 'must be set forth with such clarity as to be understandable.'", quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

If the ALJ creates an accurate and logical bridge between the evidence and the result, this Court will not step in to re-weigh that evidence. *Jones*, 336 F.3d at 477-76. Yet again, "if relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader*, 2012 WL 5383120, at *6; *see also Bowen*, 478 F.3d at 749. Thus, that logical bridge is not built – whether by omission or by confusion – this Court will not hesitate to remand. *Fleischer*, 774 F. Supp. 2d at 877.

In all, I reach this decision largely based on the ALJ's silence with respect to Hargis' bilateral upper extremity impairments. In particular, I note that each of these issues – tremor, numbness, and arthritis – likely result in differing impact on her ability to use her bilateral upper extremities. As such, it is unclear whether a limitation to frequent operation of hand controls bilaterally, frequent handling, fingering, and feeling bilaterally, and occasional reaching overhead (Tr. 24) is appropriate. And where the decision is silent, this Court may not determine the matter anew. *E.g. Shrader*, 2012 WL 5383120, at *6. The explicit avoidance of a vocationally relevant term as vague in one context while permitting it in another adds more confusion than it clarifies. It is not for this Court to decide the relevance of those vocational terms. The Agency requires an explanation so that the claimant may understand their RFC, and the mixed use of terms with respect to noise and pulmonary irritants fails in this regard. I cannot determine the ALJ's intent in this decision. On this basis, I recommend the District Court remand for Hargis' RFC to be re-decided consistent with Agency regulations and this Report and Recommendation.

24

## VII.     Recommendation

Because the ALJ failed to apply proper legal standards to support her decision, I recommend that the Commissioner's final decision denying Hargis' application for DIB be vacated and that her case be remanded for further consideration.

Dated: January 2, 2026

Reuben J. Sheperd
United States Magistrate Judge

_____

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).